United States District Court
Middle District of Florida
Jacksonville Division

**KENDALL JEVON JACKSON,**

     *Plaintiff,*

v.                                                    **3:12-cv-388-J-34PDB**
                                                      **3:10-cr-198-J-34TEM**

**UNITED STATES OF AMERICA,**

     *Defendant.*

---

# Report & Recommendation

Before the Court is Kendall Jackson's 28 U.S.C. § 2255 motion, in which he claims that his trial counsel, Assistant Federal Defender James Burke, Jr., rendered ineffective assistance of counsel in the underlying federal criminal case against him by failing to file a notice of appeal despite his request that he do so (ground one), to investigate the facts of one of the two charges against him (ground two), and to convey all plea offers to him (ground three). Civ. Docs. 1 (motion), 7 (response), 8 (reply).

The Honorable Marcia Morales Howard granted Jackson's request for an evidentiary hearing on ground one, and, under 28 U.S.C. § 636(b) and Rule 8 of the Rules Governing Section 2255 Proceedings, referred the motion to me to appoint counsel to represent him, conduct the hearing, propose factual findings, and recommend a disposition, focusing on issues derived from *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), and *Gomez-Diaz v. United States*, 433 F.3d 788 (11th Cir. 2005):

    (1)    whether Jackson specifically requested his trial counsel to file a notice of appeal, thereby triggering counsel's duty to do so;

(2)     if Jackson did not specifically direct his attorney to appeal, whether either (a) a rational defendant would want to appeal, or (b) Jackson reasonably demonstrated to counsel that he was interested in appealing, and

(3)     if the Court answers either part of Question 2 in the affirmative, whether counsel consulted with Jackson in a reasonable effort to determine the client's wishes, and whether counsel acted in accordance with those wishes.

Civ. Doc. 10 at 2.[1]

I appointed Eric Roper, Esquire, to represent Jackson, Civ. Doc. 11, and conducted the hearing on August 12, at which both Jackson and Burke testified, and I admitted without objection government exhibits 4 (Burke's sentencing calculations for Jackson during a meeting) and 5 (Jackson's follow-up note to Burke expressing his desire to plead guilty, his inability to provide substantial assistance, and his trust in Burke), Civ. Docs. 14 (minutes), 15 (transcript), 14-1 (government exhibit 4), 14-2 (government exhibit 5).

At the end of the hearing, Jackson's counsel conceded that ground one of Jackson's § 2255 motion pares down to the first issue in the above block quote, and that issue pares down to a credibility assessment of Jackson. Civ. Doc. 15 at 79−80. (In other words, as to the second and third issues in the above block quote, Jackson's counsel conceded that a rational defendant would not have wanted to appeal and that, setting aside the contention that Jackson had expressly asked Burke to file a notice of appeal, Jackson had not otherwise reasonably demonstrated to Burke that he was

---

[1]Judge Howard separately asked me to address all three of Jackson's claims in the report and recommendation.

2

interested in appealing. *Id.* at 81−82.) Finding Jackson's testimony incredible on certain points and concluding that none of his asserted grounds for post-conviction relief has merit, I recommend denial of his § 2255 motion. And concluding that he has not made a substantial showing of the denial of a constitutional right, I also recommend denial of a certificate of appealability.

## I.   Background

Jackson is in his 30s, withdrew from school in the tenth grade, and has no mental-health issues, employment history, or prior criminal convictions. Crim. Doc. 89 at 10; Crim. Doc. 90 at 5−6; Presentence Investigation Report ("PSR") ¶¶ 34, 43, 46, 48. A grand jury charged him and Angelica Perez with conspiring to possess 500 or more grams of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846, and him alone with possessing a firearm in furtherance of that crime, in violation of 18 U.S.C. § 924(c). Crim. Doc. 1. The drug charge exposed him to mandatory minimum five-year prison and four-year supervised-release terms, 21 U.S.C. § 841(b)(1)(B), and the gun charge exposed him to a mandatory consecutive minimum five-year prison term, 18 U.S.C. § 924(c)(1)(A)(i).

At the end of a contested detention hearing, the Honorable Thomas Morris released Jackson on bond. Crim. Docs. 29−31. Later, Judge Morris ordered him to show cause why bond should not be revoked based on a urinalysis indicating that he had used cocaine. Crim. Doc. 49. At the end of a contested evidentiary hearing, Judge Morris declined to revoke bond because Jackson had passed a polygraph test indicating that he had not used cocaine. Crim. Doc. 53.

Following a Federal Rule of Criminal Procedure 11 colloquy, Crim Doc. 89, Jackson pleaded guilty without a plea agreement, Crim. Doc. 74, and the Court accepted his plea, Crim. Doc. 79. At the change-of-plea hearing, he twice insisted that he did not want to go to trial and confirmed that he understood the charges against him and the penalties he faced, including the total minimum of ten years' imprisonment. Crim. Doc. 89 at 19−21, 26, 34, 43.

To support his guilty pleas, Jackson admitted the following factual bases. *Id.* at 28−31. A confidential source for the Drug Enforcement Administration placed a recorded call to Perez when she was with Jackson. *Id.* at 28. The source and Jackson discussed the source's sale of cocaine to someone else, that more would arrive, and that the source would reserve four kilograms for Jackson. *Id.* Through later recorded calls, the source and Perez arranged to meet at the Walmart on Philips Highway. *Id.* at 28–29. Five days after the initial recorded call, an undercover DEA agent and the source, equipped with audio and video recording equipment, arrived at the Walmart and called Perez to let her know that they were there. *Id.* Perez and Jackson arrived in a Mercedes, got out, and negotiated a price for four kilograms of cocaine. *Id.* An undercover detective with the Jacksonville Sheriff's Office arrived and showed them purported cocaine. *Id.* Jackson left to gather money to buy it. *Id.* Agents watched him go to his home, some businesses, and another home. *Id.* Perez called the source, said that she and Jackson had gathered only enough money to buy two kilograms, and agreed to meet back at the Walmart for the transaction. *Id.* at 30. They arrived in the same Mercedes. *Id.* Jackson got out with a bag of cash, a takedown signal was made,

and the agents arrested him and Perez. *Id.* He admitted that there was a weapon behind the driver's seat, and the agents found a loaded and chambered gun there. *Id.* In addition to the money in the bag, he had $3,100 on him. *Id.* Jackson and Perez denied knowing where the money had come from. *Id.* at 30–31. He admitted that the gun was his but insisted that he could legally carry it. *Id.* at 31.

While admitting those factual bases and confirming that he had intended to possess and distribute the cocaine, Jackson emphasized that he had never actually possessed the cocaine. *Id.* at 35–36. (At the earlier contested detention hearing, in response to Burke's question about whether the cocaine had been controlled by the agents such that it never would have found its way to the streets, the prosecutor had proffered that, during the first Walmart meeting, Jackson had pointed to empty kilogram-shaped wrappers in his car to suggest that he had sold cocaine before, but the wrappers had not been there at the second Walmart meeting.[2]) And he disputed the negotiated price per kilogram and the amount of money in the bag. *Id.* at 26–27. Although the proposed factual basis for the drug charge purported that $30,000 had been in the bag, Crim. Doc. 72 at 6, he insisted that he had negotiated a price of $28,500 per kilogram, and, based on that price and his planned purchase of two kilograms, $57,000 had been in the bag, Crim. Doc. 89 at 26–27, 30–34, thus suggesting that someone had pocketed the difference. With the parties' agreement, Judge Morris noted the factual dispute and proceeded to accept his guilty pleas,

---

[2]A recording of the contested detention hearing is available from the clerk's office but has not been transcribed.

concluding that the amount of money in the bag did not affect the sufficiency of the admitted elements of the charged drug crime. *Id.* at 32−35.

The offense-conduct section of the PSR essentially mirrored the proposed factual bases. *Compare* Crim. Doc. 72 at 4−7 *with* PSR ¶¶ 6−14. At the sentencing hearing, in response to the Court's inquiry concerning any objections to the PSR facts, Burke repeated Jackson's previously voiced disagreement with the amount of money in the bag but explained that he had told Jackson that he "didn't think it made any difference and probably wouldn't help[.]" Crim. Doc. 90 at 6. Jackson interjected: "And these numbers wrong. These numbers are wrong … Yeah, these numbers [sic] wrong … we negotiated. That's not it. You know, that was not it. You know, I don't know what happened to the rest of the $27,000, but that's not it because it was just 28,5 apiece, 57 for two. I don't know what y'all did with the 30 because 30's not even negotiated." *Id.* He continued: "It's on the wiretap. It's on the wiretap. We got it—he got a wiretap, don't you, and we got—he got it, so I don't know what he talking about. He going to put 30? It's 28,500. That's wrong." *Id.* The prosecutor explained that, for the factual basis for the drug charge, he had relied on agent reports indicating that law enforcement had seized $30,000. *Id.* at 7−8. Because Burke stated that he was not asking the Court to modify the PSR facts, the Court did not resolve the factual dispute. *Id.* at 8.

As a crime punishable by up to 40 years' imprisonment, the drug crime was a class B felony. *See* 21 U.S.C. § 841(b)(1)(B) (maximum unenhanced prison term for drug crime involving 500 or more grams of cocaine is 40 years); 18 U.S.C. § 3559(a)(2)

(crime punishable by 25 or more years' imprisonment is class B felony). Without objection, for the drug crime, the Court found total offense level 23 and criminal history category I, which, but for the five-year mandatory minimum prison term that automatically made the guidelines recommendation 60 months, would have resulted in a range of 46 to 57 months' imprisonment. Crim. Doc. 90 at 8–9; PSR ¶¶ 52, 54; *see* 21 U.S.C. § 841(b)(1)(B) (minimum unenhanced prison term for drug crime involving 500 or more grams of cocaine is five years); USSG Ch. 5, Pt. A (2010) (Sentencing Table) (imprisonment range for offense level 23 and criminal history category I is 46 to 57 months); USSG § 5G1.1(b) (2010) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). For supervised release, the Court found that both the guidelines and statutory ranges were four to five years. Crim. Doc. 90 at 8; PSR ¶¶ 56, 58; 21 U.S.C. § 841(b)(1)(B) (minimum unenhanced supervised-release term for drug crime involving 500 or more grams of cocaine is four years); 18 U.S.C. § 3583(b)(1) (maximum term of supervised release for class B felony is five years); USSG § 5D1.2(c) (2010) ("The term of supervised release imposed shall be not less than any statutorily required term of supervised release.").

As a crime punishable by up to life imprisonment, the gun crime was a class A felony. *See* 18 U.S.C. § 924(c)(1)(A)(i) (minimum prison term for person who possesses a firearm in furtherance of a drug-trafficking crime is five years consecutive to prison term for drug-trafficking crime); *United States v. Pounds*, 230 F.3d 1317, 1319 (11th

Cir. 2000) (maximum prison term for any § 924(c)(1)(A) crime is life); 18 U.S.C. § 3559(a)(1) (crime punishable by life imprisonment is class A felony). Without objection, for the gun crime, the Court determined that the statutory mandatory consecutive five-year minimum became the guideline recommendation independent of the guideline recommendation for the drug crime. Crim. Doc. 90 at 8; PSR ¶¶ 53, 55; USSG § 5G1.2(a) (2010) ("[T]he sentence to be imposed on a count for which the statute (1) specifies a term of imprisonment to be imposed; and (2) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment, shall be determined by that statute and imposed independently."). For supervised release, the Court found that the statutory maximum was five years and the guidelines range was three to five years. Crim. Doc. 90 at 8; PSR ¶¶ 57, 59; *see* 18 U.S.C. § 3583(b)(1) (maximum term of supervised release for class A felony is five years); USSG § 5D1.2(a)(1) (2010) (guidelines range for supervised release for class A felony is three to five years).

Both the prosecutor and Burke recommended the 60-month mandatory minimum prison term for the drug charge and the 60-month mandatory consecutive minimum prison term for the gun crime, for a total of ten years' imprisonment. Crim. Doc. 90 at 19, 21. About Jackson, Burke observed, "from the very beginning … he was a truth-teller, and that has probably cost him in some ways. He told me from the git-go that the money came from his grandmother, who recently died. He admitted all that. He said, 'I have no idea where the rest of that money went.'" *Id.* at 21. Burke also recalled Jackson's successful polygraph test. *Id.* Burke concluded, "So you have

two things that he told the truth about, and I always found him very compelling personally. He's a decent guy, got no priors. He was sort of enamored with Ms. Perez, and they got together and did this thing, so I think it's right that they have an equal sort of a—he brought the money; she had the contact. … But it was basically a government flim-flam from the git-go, and so I would suggest that the ten years is correct. There's nothing the Court can do." *Id.* at 22.

After Burke had recommended incarceration in Jesup, Georgia, and observed that Jackson has used marijuana and ecstasy in the past but does not have a current drug problem, Jackson interjected to say, "Yeah, I have. I have in the past. Yes, I have." *Id.* Jackson then immediately shifted focus to the gun:

> And that gun was in the car. I was not in the car. … I was outside the car. I was not going to use no gun on nobody. I had the money, and—I ain't going to lie to you, I had the money. Of course I had the gun. That gun was in my name. Yes, it was. I just want you to know that. … I wasn't going to use no gun on nobody. That gun was there because of that money. It was just too much money, too much money. Of course you're going to have a gun. Someone might kill you out there. You know, I'm just saying. You know, I can't even have that money without a gun, you know, or something, butter knife or a switch blade or something.

*Id.* at 22−23. He then revisited the dispute concerning the amount of money in the bag, insisting, again, that there had been $57,000 in the bag based on a negotiated deal of two kilograms of cocaine for $28,500 per kilogram. *Id.* at 23. The Court started to explain, "All right. Well, there's—how much money was ultimately there doesn't impact the sentence and so we'll let you all figure out what, if anything," but the Court stopped when Jackson turned to leave. *Id.* When the Court told him not to turn away, he apologized and said that he had thought the hearing was over. *Id.* at 23−24.

The Court expressed its dismay that someone his age and without a criminal history could become involved in serious crimes, and he explained, "But I'm telling you the truth. I got to tell you the truth. Your Honor, Judge, I got to tell you the truth. I don't do nothing. You know, I don't do nothing. We are not drug dealers. … We was fixing to do something, but we never did. We never touched no drug. The man came and showed some, but he did not—I did not know what that was when he came and he said he showed something to her. He didn't show us nothing like—like—it was just an object. It was not—it was an object." *Id.* at 24. The Court asked, "You were there to buy drugs though, right?" *Id.* He confirmed, "Yeah, I was there. I was there, yeah." *Id.*

Burke stated that Jackson did not object to forfeiture of the money and the gun, and Jackson interjected, "Yes. I don't want nothing. No, no, no." *Id.* at 26. The Court sentenced Jackson to the five-year mandatory minimum prison term for the drug crime and the five-year mandatory consecutive minimum prison term for the gun crime, for a total of ten years' imprisonment, to be followed by concurrent five-year terms of supervised release. *Id.* at 28. The Court did not impose a fine or order restitution. *Id.* at 29. The Court imposed the mandatory $200 special assessment. *Id.*; *see* 18 U.S.C. § 3013(a)(2)(A) (requiring $100 special assessment against an individual convicted of felony offense against the United States). The Court ordered forfeiture of the gun and $33,100 ($30,000 from the bag and the $3,100 that Jackson had had on him). Crim. Doc. 90 at 29.

At the end of the sentencing hearing, the Court explained directly to Jackson that he had a right to appeal the sentence but would give up that right if he did not file a notice of appeal within 14 days. *Id.* at 32. The Court advised him that he was entitled to be represented by counsel "in any appeal that's taken," that the Court would appoint counsel at no cost to him if he could not afford one, and that he could file a notice of appeal without paying the filing fee if he could not afford it. *Id.* The Court asked him if he had any questions "about those things," and he responded, "No ma'am." *Id.* The Court asked if anyone objected to the sentence or the manner in which the Court had imposed. *Id.* at 33. No one did. *Id.*

The Court entered judgment of conviction on April 27, 2011. Crim. Doc. 84. No one filed a notice of appeal.

## II.     Section 2255 Motion & Response

Almost one year later, on April 3, 2012, Jackson mailed his pro se § 2255 motion. Civ. Doc. 1. Because he filed it within one year of when the judgment of conviction became final, the motion is timely. *See* 28 U.S.C. § 2255(f)(1) (one-year limitation period for filing § 2255 motion runs from date on which judgment of conviction becomes final); *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011) (if defendant does not appeal his conviction or sentence, judgment of conviction becomes final when time for seeking review becomes final); Fed. R. App. P. 4(b)(1)(A)(i) (2010) (defendant must file notice of appeal within 14 days). As stated above, he claims that Burke rendered ineffective assistance of counsel in three ways: by failing to file a notice of appeal despite his request that he do so (ground one),

11

failing to investigate the facts of the gun charge (ground two), and failing to convey all plea offers to him (ground three). Civ. Doc. 1.

## A.      Ground One (Failure to File a Notice of Appeal)

In claiming that Burke had rendered ineffective assistance of counsel by failing to file a notice of appeal despite his request that he do so, Jackson contends, "In this matter, Jackson immediately after the court imposed the 120 month sentence, requested his counsel file a Notice of Appeal. Jackson repeated these instructions to his counsel prior to counsel exiting the courtroom. Despite these specific instructions, no notice of appeal was ever filed. Further, no additional papers of any kind were filed by Jackson's counsel. Jackson fully intended to pursue an appeal." *Id.* at 15. The United States responds that the Court should deny his claim because the Court had told him about his appellate rights and the 14-day deadline for filing a notice of appeal but he did not mail his § 2255 motion until almost a year later. Civ. Doc. 7 at 7–8. He replies that the United States' response is "misplaced" because his "instructions to file an appeal were given after the sentencing but prior to [his] counsel's exiting the Courtroom." Civ. Doc. 8 at 1–2.

## B.      Ground Two (Failure to Investigate)

In claiming that Burke had rendered ineffective assistance of counsel by failing to investigate the gun charge, Jackson contends that Burke "failed to perform any investigation whatsoever into the facts supporting [the gun charge]. Had counsel conducted an investigation concerning the facts, he would have discovered that the gun involved was not used in any manner whatsoever as part of the one drug

transaction involved in this matter. Fu[r]ther, the gun was not in close proximity to Jackson when the drug transaction … occurred." Civ. Doc. 1 at 15−16. The United States responds that the Court should deny his claim because the facts that he had admitted (the gun was his, the gun had been within his reach, and he had brought the gun because of the large amount of cash involved in the transaction) clearly establish a § 924(c) violation. Civ. Doc. 7 at 8−9. Jackson replies that because Burke had failed to investigate the charge, he "had no other viable option but to plead guilty" to it. Civ. Doc. 8 at 2.

## C.    *Ground Three (Failure to Convey All Plea Offers)*

In claiming that Burke had rendered ineffective assistance of counsel by failing to convey all plea offers to him, Jackson contends that "[a]t the time of his sentence [sic] hearing, [he] learned for the first time that the offer he agreed to had expired. His counsel failed to advise him of any deadline for acceptance of such offer. As a result, Jackson was required to accept a deal from the government with more severe terms, i.e. more months in prison." *Id.* at 16−17. The United States responds that the Court should deny his claim because he had pleaded guilty before the plea deadline and, further, that the United States had not been able to offer any deal that would have allowed the Court to impose a sentence below the statutory minimum terms. Civ. Doc. 7 at 10−11. He replies that he had "entered his plea based upon information from his counsel that he would receive a lesser term of imprisonment. … His counsel never advised him that the only plea agreement was for what he actually received." Civ. Doc. 8 at 2.

### III.   Evidentiary Hearing

### A.   *Jackson's Testimony*

Jackson testified as follows. Civ. Doc. 15 at 5−53. The only time that he talked to Burke about an appeal was on the day of the sentencing hearing. *Id.* at 6. Right before the hearing, he met with Burke on a bench outside of the courtroom, near the window overlooking the state courthouse, and told Burke that he wanted to file an appeal. *Id.* at 6−7, 27−28. Burke responded by nodding his head and explaining that the Court could not sentence him below mandatory minimum terms. *Id.* at 7. Later, during the sentencing hearing itself, right before approaching the lectern for the pronouncement of the sentence, he again told Burke that he wanted to file an appeal and asked him to come to the holding cell after the hearing to talk. *Id.* at 9, 30. Burke stood up, and Jackson thought that they were "on the same page." *Id.* at 9. But that was the last communication that he had with Burke on any subject. *Id.* at 10. Upon cross-examination by the prosecutor, Jackson did not explain why he had inconsistently said in his § 2255 motion that he had told Burke to file a notice of appeal right after the Court had imposed sentence. *Id.* at 38−40.

Jackson conceded that he had pleaded guilty because he was guilty, that Burke had done a good job for him until the sentencing hearing, that both he and Burke had conveyed to the Court his concern about the amount of money in the bag, and—at least at first—that he had known that the Court could not sentence him to less than ten years' imprisonment. *Id.* at 8, 15, 24−27, 33. Asked why he had wanted to appeal then, he alternated between two reasons: "I told [Burke] I wanted to file my direct

appeal because of the money that I had missing. That's all," and, "I told [Burke] I wanted to file an appeal because I was accused of having drugs around the same officers, and I said, 'I really need to file an appeal.'" *Id.* at 7–8. He contended that the PSR facts about the amount of money in the bag had been "fabricated," that "y'all robbed me," that the prosecutor had lied during the contested detention hearing when proffering that he had possessed "brick wrappers" during the first Walmart meeting, and that the urine sample suggesting that he had used cocaine during pretrial release had been "tampered with." *Id.* at 16, 20, 28. He had just wanted someone to look over the case, and, moreover, had not wanted the prosecutor to "get away with" his lie. *Id.* at 30−31. Asked if he had told Burke why he wanted to appeal, he responded, "No, I ain't tell him that." *Id.* at 28.

Jackson acknowledged that he had understood the Court's explanation of his appellate rights to him but explained that he had not filed a notice of appeal himself because he had been "going through a lot" with the death of his father and grandmother right before his arrest. *Id.* at 11−13. Emphasizing that he had told Burke to file a notice of appeal, he added that he had "thought that's what my counsel was there for." *Id.* at 13. He discovered that Burke had not filed a notice of appeal about five or six months after the sentencing hearing when fellow inmates asked him if he had heard from his counsel and told him that his counsel was supposed to contact him. *Id.* at 11−12. Because he was "kind of green toward the system," he did not know any better. *Id.* at 12. But if he had known that Burke was not going to file a notice of

appeal, he would have filed one himself. *Id.* at 42. Asked again why he had wanted to

appeal, he testified:

> It was—it was because my grandma and my daddy, their money, and when I was sitting in prison and kept sitting in prison, it was like I didn't do nothing to fight for their money that I had.
>
> So at least I have the right and I'm glad that I had the chance to come up here today, because I really just want to—you know, I'm sorry for even dealing with them dead people money, period. I'm sorry with dealing with dead people money, and I wish I could take it all back, but I can't take it all back. I just got to deal with it. … So that's one reason why I wanted to file my direct appeal.

*Id.*

The following colloquy concerned whether Jackson had drafted his § 2255

motion himself:

| | |
|---|---|
| THE COURT: | You have indicated you drafted the 2255— |
| [JACKSON]: | Yes. |
| THE COURT: | —petition? |
| [JACKSON]: | Yes. |
| THE COURT: | Did you use the form? … [D]id you have something to look at when you drafted it, someone else's 2255? |
| [JACKSON]: | Not really, no. |
| THE COURT: | Did you draft that from scratch, then? |
| [JACKSON]: | Yeah, basically. |
| THE COURT: | You're hesitating a little bit. |
| [JACKSON]: | Yeah, basically, yeah. |
| THE COURT: | All right. |

| | |
|---|---|
| [JACKSON]: | I was looking over a lot of little, you know, work. No, no, not paperwork but just books from— |
| THE COURT: | Had you seen other people's 2255s when you drafted that? |
| [JACKSON]: | Did I see anybody's 2255? |
| THE COURT: | Yes. |
| [JACKSON]: | No. No. Not in this there. |
| THE COURT: | You've never seen— |
| [JACKSON]: | No. |

*Id.* at 44–45.

And this colloquy concerned Jackson's claim that Burke had not conveyed all plea offers to him:

| | |
|---|---|
| THE COURT: | Can you tell me what you were talking about [in ground three]? |
| [JACKSON]: | Oh, I was talking about when—the time that I told Mr. Burke I was supposed to had a—I made like a deal, like a deal with the prosecutor, like I was—I—I guess they was, like, thinking that I was going to work for them or bust people for them. |
| | So that kind of took a while. I been—I was at the house under a lot of medical issues then, but I—that was like—like a snitch plea a little bit, you know, like, you know, to kind of cooperate with the government, you know. |
| | And then I didn't—it was about—then I kind of changed it. I changed it. I told them … I didn't have nothing to say to them. … |
| THE COURT: | In the 2255 motion, what were you trying to do there? What kind of relief were you trying to get from that? |

17

[JACKSON]:        I was just stating the facts, you know. I was just stating the facts.

THE COURT:        But what were you talking about as far as expired plea or expired formal offer? What is that?

[JACKSON]:        Like—like, I was going to cooperate with them. Basically that's it—

THE COURT:        Was there—

[JACKSON]:        —like an offer.

THE COURT:        Was is your understanding that there was another formal offer?

[JACKSON]:        No, not really. I thought it was going to be kind of below ten years, like, you know, below ten years, but it wasn't.

THE COURT:        Okay. Why did you think it would be below ten years?

[JACKSON]:        Because I hadn't never been in no trouble before. You know, I didn't—I didn't really know how y'all—you know, how the federal system, you know, do their—you know, play.

THE COURT:        But at the point that you pleaded guilty before Judge Morris, you understood that it was going to be ten years—

[JACKSON]:        Yes.

THE COURT:        —at least?

[JACKSON]:        Yeah, at—least. But—but—but I had not saw, you know, like a—you know, like at sentencing, I didn't know how—if—if it could have been up under ten years or not. I didn't know. I didn't know that when they say minimum, it mean minimum. You know, I didn't know that.

You know, but now I'm like, you know—you know, after I got in prison, you know, I was faced with—I was getting out in 2019, so I kind of understood then.

THE COURT:      You didn't know what minimum meant?

[JACKSON]:      No. I knew what minimum meant, but I thought that a judge can give me the time that they wanted to give me, you know, sort of like state time, you know, sort of like state time.

But I knew it was—he said minimum, but I'm thinking that if I get to the judge, you know, in sentencing, that the judge might say under—under ten. But they kept telling me that you couldn't get up under the minimum guideline.

THE COURT:      Okay.

[JACKSON]:      So basically the prosecutor had all the pull, so if I didn't work with the prosecutor, I wasn't fixing to get no relief. Basically that's what this—you know—

THE COURT:      Okay.

[JACKSON]:      The prosecutor got all the pull, yeah.

*Id.* at 46−48. The prosecutor confirmed that the United States had not made any formal offers in the criminal case and observed that nothing in its files indicated that Jackson had wanted to try to provide substantial assistance. *Id.* at 92.

### B.   *Burke's Testimony*

Burke testified as follows. *Id.* at 54−77. He has practiced criminal law for 29 years. *Id.* at 64. While representing Jackson, he was the supervisor of the Federal Defender's Office in Jacksonville. *Id.* at 54. He began representing Jackson at Jackson's initial appearance. *Id.* Because of the audio- and video-recordings and Jackson's admission to law enforcement that the gun belonged to him, the case was

19

"pretty open-and-shut." *Id.* at 54–55. Although it did not help his defense, Jackson was "fixated" on the amount of money in the bag because he had obtained it from his family. *Id.* at 55–56. He met with Jackson in his office to discuss whether to plead guilty and the penalties he faced. *Id.* at 56–57; Civ. Doc. 14-1. He was concerned because neither Jackson nor his mother seemed to have a realistic understanding of the minimum mandatory terms. Civ. Doc. 15 at 58. As his contemporaneous notes from the meeting reflect, he explained to Jackson that ten years equates to eight years, seven months, and nine days, and that the only way to reduce that time was to cooperate.[3] *Id.* at 58–60; Civ. Doc. 14-1; 18 U.S.C. § 3624(b)(1) (crediting inmates with up to 54 days a year for good behavior). He did not perceive any other way to reduce that time because he knew that the United States Attorney's Office would not move to dismiss the lone drug charge because the DEA had initiated the case and that high levels within the United States Attorney's Office would have to approve moving to dismiss the gun charge. Civ. Doc. 15 at 60. Two days after the meeting, Jackson followed up with a written letter stating, "I, Kendall Jackson will take a regular plea. I do not have anything to say pertaining to any person. I hav[e]n't discussed my case with [anyone] but my attorney (Mr. Burke Jr.). I respectfully trust

---

[3]As a "very quick little loop of how to tell people what the reality is so that they don't get any false ideas that there's going to be some lesser sentence," Burke always told clients a "little rap": "[T]here's two programs in the federal system. You got the prison program; you got the rat program. They both go to prison, but the rat program goes half as long as the prison program. What do you want to be, a rat or in the prison program?" Civ. Doc. 15 at 60–61.

my Attorney." Civ. Doc. 14-2. Burke's last communication with Jackson was at the sentencing hearing. Civ. Doc. 15 at 71.

In Burke's standard practice during the timeframe involved here, if a client wanted to talk about an appeal before the sentencing hearing (a highly unusual circumstance), unless the case involved a suppression or trial issue, Burke would advise him to wait to hear what sentence he received. *Id.* at 61. Before the sentencing hearing, he would meet with a client on the same bench described by Jackson to "have a little heart-to-heart" about allocution and make sure the client did not plan to say "anything untoward at their own sentencing." *Id.* at 62. If, at the sentencing hearing, a client stated that he wanted to appeal, Burke, upon returning to his office, would immediately instruct his secretary to file a notice of appeal. *Id.* at 63. If the client said nothing about an appeal, Burke would not automatically meet with the client to discuss an appeal; rather, he would assess whether to do so on a case-by-case basis (considering, for example, whether the client had pleaded "straight up," whether the Court had denied a motion to suppress, or whether the Court had imposed a mandatory minimum prison term).[4] *Id.* at 74. He kept all written correspondence and phone messages from clients in case files. *Id.* at 72–73.

---

[4]After the timeframe involved here, the Federal Defender's Office in the Middle District of Florida encouraged the "better practice to go and visit the client subsequent to sentencing and have a conversation about their appellate rights and to document it and, you know, to make an actual, physical appointment with the clients to discuss the matter of appeal with them as opposed to just making it kind of loosey-goosey." Civ. Doc. 15 at 70.

Burke did not recall having discussed (and doubted that he had discussed) an appeal with Jackson, whether before, during, or after the sentencing hearing, and the file for Jackson's case did not contain any written communications or messages about an appeal. *Id.* at 61, 66, 71–72. Burke recalled having sometimes discussed appeals with other clients before Deputy Marshals escorted them out of the courtroom at the end of sentencing hearings, but he did not recall having done so with Jackson. *Id.* at 65. Even though nothing suggested that an appeal was warranted (the Court imposed the mandatory minimum terms, Burke successfully defended the contested motions for detention and to revoke bond, no other motion had been filed, and the money in the bag did not impact the sufficiency of the evidence for either crime and was forfeitable no matter the amount), Burke would have filed a notice of appeal if Jackson had wanted him to do so. *Id.* at 66–67.

## IV.  Proposed Findings of Fact

Although Jackson was forthright on some points (for example, his guilt and his understanding of his appellate rights, Civ. Doc. 15 at 8, 15, 24–27, 33), and Burke at least at one time had believed that he was a "truth-teller," Crim. Doc. 90 at 21, I find that his testimony on other points was incredible; specifically that he had told Burke that he wanted to appeal, Civ. Doc. 15 at 6–7, 9–10, 27–28, 30, that he had thought that the Court could sentence him to less than ten years' imprisonment regardless of

the minimum mandatory terms, *id.* at 46–48, and that he had drafted his § 2255 motion from scratch and without reference to any form or sample, *id.* at 44–46.[5]

Closely observing his demeanor and listening to his pauses and voice inflections while he testified, Jackson did not impress me as someone who was telling the truth on those points. He had a reason to lie about whether he had told Burke to file a notice of appeal (the success of ground one depends on this point) and he has a personal interest in the outcome of the motion (the otherwise-lost right to pursue a direct appeal). His testimony about whether he had told Burke to file a notice of appeal differed from the facts that he had set forth in his § 2255 motion (he testified that he had told Burke to file a notice of appeal right before the sentencing hearing and again right before the Court imposed sentence, *id.* at 6, 9, but states in his § 2255 motion that he had done so after the Court imposed sentence, Civ. Doc. 1 at 15), and he could not explain the inconsistency upon questioning, Civ. Doc. 15 at 38–40. He

[5]Whether Jackson drafted his § 2255 motion on his own is pertinent only to his general credibility, not to the substantive merits of his claims. His motion and its incorporated memorandum appear to be written by a lawyer, and, in particular, a lawyer with experience in the nuanced § 2255 area: it sets forth only the pertinent facts and law, it cites statutes and cases in accordance with the Bluebook, it raises only claims cognizable under § 2255, and it is written as well as filings by experienced lawyers. *See* Civ. Doc. 1. Jackson appeared intelligent at the evidentiary hearing. Nevertheless, it is highly unlikely that he drafted the § 2255 motion, particularly, as he claimed, without having looked at anyone else's § 2255 motion. He withdrew from school in the tenth grade, PSR ¶ 46, he had to take the GED examination twice, Crim. Doc. 90 at 5–6, he has no employment history or otherwise apparent legal training, PSR ¶¶ 48–49, he hedged and hesitated when I asked him about his claim that he had drafted the § 2255 motion himself, Civ. Doc. 15 at 44–45, and the facts set forth in his third ground (failure to convey a formal plea offer), Civ. Doc. 1 at 4–5, bear no resemblance to the facts about which he testified at the evidentiary hearing, Civ. Doc. 15 at 45–48.

never tried to contact Burke after the sentencing hearing to find out why he had not met with him after the sentence hearing as he assertedly had requested or the status of the appeal that he assertedly thought had been filed, Civ. Doc. 15 at 10, instead waiting almost a year and directly filing his § 2255 motion within weeks of its deadline, Civ. Doc. 1. He alternated between reasons for having wanted to file an appeal (between wanting to address the amount of money in the bag, "[t]hat's all," Civ. Doc. 15 at 7, to wanting to address the prosecutor's assertion at the contested detention hearing that cocaine wrappers had been in his car during the first Walmart meeting, *id.* at 28, 31). He had not said anything to the Court after the Court had advised him of his appellate rights even though he had not been shy about interjecting his thoughts and opinions during other parts of the sentencing hearing. Crim. Doc. 90 at 6, 22, 26. Not knowing what the Court would do about his concern over the amount of the money in the bag before the sentencing hearing, it does not make sense that he would have told Burke to file a direct appeal about that issue before then. Burke did not recall him having asked him to file a notice of appeal, doing so before the sentencing hearing would have been highly unusual, and Burke would have instructed his secretary to do so if Jackson had done so. Civ. Doc. 15 at 61−66, 71−72. Jackson's true motive for his § 2255 motion appeared to come through at the evidentiary hearing: he had been sitting in prison feeling bad about having used his deceased grandmother's and father's money for the cocaine transaction and about having done nothing earlier to fight for it. *Id.* at 42.

In contrast, I found Burke's testimony credible. Likewise closely observing his demeanor and listening to his pauses and voice inflections while he testified, he impressed me as someone who was telling the truth. He has neither a reason to lie nor a personal interest in the outcome of Jackson's § 2255 motion. He is a member in good standing of the Florida Bar,[6] and, as such, he is an officer of the court with a duty of candor to the tribunal. *See* Rule 4-3.3(a) of the Rules Regulating the Florida Bar ("A lawyer shall not knowingly … make a false statement of fact or law to a tribunal[.]"). His memory was sharp. His testimony was consistent with the only two written documents in his file. *Compare* Civ. Doc. 14-1 & 14-2 *with* Civ. Doc. 15 at 54−77. And his recollection of what had occurred in the case made sense.

Thus, in addition to adopting all of Burke's testimony, as well as Jackson's testimony on the points I find credible, I propose the following facts. Burke is a very experienced federal criminal defense lawyer. The United States never made a formal plea offer, and Jackson did not have any substantial assistance to offer that would have allowed the Court to sentence him below the mandatory minimum prison terms upon the United States' motion. Civ. Doc. 7 at 10−11; Civ. Doc. 15 at 46−48, 92; Civ.

---

[6]At any stage of a case and on its own, a court may take judicial notice of a fact that cannot be reasonably disputed because it either is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)–(d). If a court takes judicial notice of a fact before notifying a party, the party still may be heard upon request. Fed. R. Evid. 201(e). Objections to a magistrate judge's report and recommendation provide an opportunity to be heard. *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 508 (6th Cir. 2008). Because Burke's membership in the Florida Bar and "good standing" status can be readily and accurately determined from Florida Bar records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned, I take judicial notice of both facts.

Doc. 14-2. Knowing that the Court could not sentence him to less than ten years' imprisonment without his provision of substantial assistance and acknowledging the truth of the facts forming the essential elements of the charged crimes, he pleaded guilty because he was guilty and did not want to proceed to trial. Crim. Doc. 89 at 26, 34, 36–36; Crim. Doc. 90 at 24; Civ. Doc. 15 at 15. While he was very upset over the assertion that only $30,000 had been in the bag and the suggestion at the contested detention hearing that he had possessed cocaine wrappers before the first Walmart meeting, he never told Burke to file a notice of appeal or that he wanted to appeal, the pair never otherwise talked about an appeal about those or any other issues, and no one ever filed a notice of appeal. Crim. Doc. 89 at 26–27, 30–35; Crim. Doc. 90 at 6–7, 23; Civ. Doc. 15 at 61, 65–67, 71–72. The last communication between them was at the sentencing hearing. Civ. Doc. 15 at 10, 71. Burke would have filed a notice of appeal if Jackson had asked him to do so. *Id.* at 63, 66–67.

## V.    Recommended Disposition

### A.    *Jackson's § 2255 Motion*

A federal prisoner may move the district court that had imposed his sentence to vacate, set aside, or correct the sentence on the ground that the court had imposed it in violation of the Constitution. 28 U.S.C. § 2255(a). The court must resolve all claims for relief raised in a § 2255 motion regardless of whether the court grants or denies relief. *Rhode v. United States*, 583 F.3d 1289, 1291 (11th Cir. 2009). A claim for relief is any allegation of a constitutional violation. *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (en banc).

26

Under *Strickland v. Washington*, a criminal defendant has a Sixth Amendment right to reasonably effective legal assistance. 466 U.S. 668, 687 (1984). To prevail on an ineffective-assistance-of-counsel claim, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced him. *Id.* at 688, 690, 694. A court does not have to address both if the defendant makes an insufficient showing on one. *Id.* at 697.

Because there are "countless ways" to provide effective assistance in any given criminal case, *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014), a movant's burden under the first prong is heavy, *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). He must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and to do so must "establish that no competent counsel would have taken the action that his counsel did take," *Chandler*, 218 F.3d at 1315. The presumption, already strong, "is even stronger when the reviewing court is examining the performance of an experienced trial counsel." *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001).

To satisfy his burden under the second prong, the movant must usually demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *United States v. Verbitskaya*, 406 F.3d 1324, 1337–38 (11th Cir. 2005). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (internal quotation marks omitted).

27

1.      *Ground One (Failure to File a Notice of Appeal)*

*Strickland* applies to a claim that counsel rendered ineffective assistance by failing to file a notice of appeal or consult with the defendant about an appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). If successful, the remedy for that type of ineffectiveness is an out-of-time appeal. *Gomez-Diaz v. United States*, 433 F.3d 788, 793 (11th Cir. 2005).

Counsel who disregards a defendant's instruction to file a notice of appeal renders ineffective assistance. *Flores-Ortega*, 528 U.S. at 477. "At the other end of the spectrum," a defendant who instructs his counsel to not file a notice of appeal cannot later complain that his counsel rendered ineffective assistance by following his instruction. *Id.* For a case in between in which a defendant has not instructed his counsel one way or the other, whether counsel rendered ineffective assistance "is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal." *Id.* at 478. "Consult" means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* It requires more than just asserting the view that an appeal will not succeed. *Thompson v. United States*, 504 F.3d 1203, 1207 (11th Cir. 2007).

If counsel consulted with the defendant, he renders ineffective assistance only by failing to follow his client's instruction to file a notice of appeal. *Flores-Ortega*, 528 U.S. at 478. If counsel did not consult with the defendant, "the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the

defendant itself constitutes deficient performance." *Id.* Counsel must consult with the defendant about an appeal if "there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 480.

In determining whether counsel had a duty to consult with the defendant about an appeal, a court must consider all of the information that counsel had known or should have known. *Id.* A "highly relevant" factor is "whether the conviction follows a trial or guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.* Even if the defendant had pleaded guilty, "the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* "Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal." *Id.*

A defendant may reasonably demonstrate to counsel that he is interested in appealing by expressing unhappiness with his sentence compared to those of his codefendants, *Thompson,* 504 F.3d at 1207, or by asking his counsel after sentencing, "What's next? What can we do now?" and then appearing "crushed" upon hearing that nothing could be done, *Palacios v. United States,* 453 F. App'x 887, 889 (11th Cir.

2011). In contrast, in *Devine v. United States* and *Otero v. United States*, the Eleventh Circuit held that counsel does not have a duty to consult about an appeal where such expressions are absent and the defendant receives a sentence at the bottom of the United States Sentencing Guidelines range after pleading guilty and waiving the right to appeal his sentence. *Devine,* 520 F.3d 1286, 1288–89 (11th Cir. 2008); *Otero,* 499 F.3d 1267, 1270–71 (11th Cir. 2007).

If counsel rendered ineffective assistance either in failing to file a notice of appeal as instructed or in failing to determine his client's wishes, prejudice is presumed insofar as the defendant does not need to identify any arguably meritorious grounds for appeal. *Gomez-Diaz,* 433 F.3d at 793. But, in accordance with *Strickland*, he still must show that "there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega,* 528 U.S. at 484. "As with all applications of the *Strickland* test, the question whether a given defendant has made the requisite showing will turn on the facts of a particular case." *Id.* at 485. A "highly relevant" factor is whether, again, there had been nonfrivolous grounds for appeal or the defendant promptly expressed a desire to appeal. *Id.* "[A]lthough showing nonfrivolous grounds for appeal may give weight to the contention that the defendant would have appealed, a defendant's inability to specify the points he would raise were his right to appeal reinstated will not foreclose the possibility that he can satisfy the prejudice requirement where there are other substantial reasons to believe that he would have appealed." *Id.* at 486 (internal quotation marks and citation omitted).

Applying those standards to the proposed findings of fact here, Burke did not render ineffective assistance of counsel by failing to file a notice of appeal or to consult with Jackson about an appeal. Because Jackson never asked him to file a notice of appeal and he never consulted with Jackson about an appeal, the Court must ask only whether, considering all of the information that Burke had known or should have known, there is reason to think that either a rational defendant would want to appeal or Jackson reasonably demonstrated to Burke that he was interested in doing so. *See Flores-Ortega*, 528 U.S. at 480. As Jackson's counsel for these § 2255 proceedings conceded,[7] Civ. Doc. 15 at 81−82, the answer to both questions is no.

Considering all of the information that Burke had known or should have known, a rational defendant would not have wanted to appeal, and Jackson had not reasonably demonstrated to Burke that he was interested in doing so. The evidence of the crimes was overwhelming; it included recordings of the drug transaction and Jackson's admission to arresting officers that the nearby loaded and chambered gun belonged to him. Crim. Doc. 89 at 28−30. Acknowledging the truth of the facts forming the essential elements of the charged crimes, *id.* at 33−36, Jackson pleaded guilty following a complete Federal Rule of Criminal Procedure 11 colloquy, *see generally id.* In doing so, he limited the scope of potentially appealable pre-sentencing issues.

---

[7]Jackson's counsel limited his concession to the extent that he did not have the PSR to determine if Jackson could have raised any guidelines issues. Civ. Doc. 15 at 81−82. The Court correctly calculated the guideline ranges for all components of the sentence. *See* pages 6 through 8 of this report and recommendation. In any event, because the Court imposed the mandatory minimum prison terms, any guideline error with respect to the imprisonment range would have been harmless.

*See Flores-Ortega*, 528 U.S. at 480 (highly relevant factor in determining duty to consult is whether conviction follows guilty plea because guilty plea reduces scope of potentially appealable issues); *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) (by pleading guilty, defendant waives all non-jurisdictional challenges to constitutionality of his conviction, and only attack on plea's voluntary and knowing nature can be sustained). Along with his repeated insistence at the change-of-plea hearing that he did not want to go to trial, Crim. Doc. 89 at 26, 34, his guilty pleas evidenced his desire to end the judicial proceedings. *See Flores-Ortega*, 538 U.S. at 480 (highly relevant factor in determining duty to consult is whether conviction follows guilty plea because guilty plea may indicate defendant's desire for an end to the case). Burke successfully defended the only two contested motions (for detention and for bond revocation), Crim. Docs. 31, 54, and, in pleading guilty without a plea agreement, Jackson did not reserve any pre-plea issues for appeal, *see generally* Crim. Doc. 89. The Court correctly determined the sentencing guidelines ranges (the mandatory minimums), and imposed the lowest possible prison terms (the mandatory minimums that had to run consecutively to each other), within the sentencing guidelines ranges for supervised release, no fine, no restitution, and the mandatory special assessments, Crim. Doc. 90 at 8, 28−29, and, therefore, Jackson did not have any meritorious sentencing issue. As Jackson himself acknowledged at the sentencing hearing, he did not contest forfeiture of the gun or cash that he had brought with him to the cocaine transaction. Crim. Doc. 90 at 26. Although he complained about the amount of money in the bag, Crim. Doc. 89 at 26−27, 30−34;

Crim. Doc. 90 at 6–7, he admitted that he had not told Burke why he assertedly had wanted to appeal. Civ. Doc. 15 at 28. Furthermore, the amount of money in the bag— whether $30,000 as the United States claimed or $57,000 as he claimed—did not impact the sufficiency of the factual basis to support his guilty plea to the drug crime, Crim. Doc. 89 at 32–35, and was forfeitable in its entirety no matter the amount as money for the cocaine and thus directly connected to the drug crime, *see* 21 U.S.C. § 853(a)(2) (person convicted of crime must forfeit property used or intended to be used, in any manner or part, to commit crime), and, therefore, Jackson did not have any meritorious forfeiture issues. Jackson did not say anything about a desire to appeal at the sentencing hearing when the Court explained his appellate rights to him even though he had not been shy about interjecting during other portions of the sentencing hearing, Crim. Doc. 90 at 6, 22, 26, and he never contacted or even tried to contact Burke after the sentencing hearing to determine if Burke had filed a notice of appeal as Jackson assertedly thought Burke was going to do, Civ. Doc. 15 at 15, 71–72.

In short, considering the relevant factors and the concession by Jackson's counsel for these § 2255 proceedings, analogous to *Devine* and *Otero*, a rational defendant would not have desired an appeal, and Jackson had not demonstrated to Burke an interest in an appeal. *Id.* Without either, and without having asked Burke to file a notice of appeal, he has not satisfied his burden of demonstrating that Burke had been constitutionally ineffective in failing to file a notice of appeal or consult with him about doing so. Thus, denial of § 2255 relief to Jackson on ground one is warranted.

33

2.      *Ground Two (Failure to Investigate)*

In *Strickland*, the Court explained how a court should evaluate a claim that counsel had been ineffective in failing to investigate. 466 U.S. at 690–91. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. The reasonableness of investigation decisions "critically" depends on information that the defendant supplies and the informed legal choices that he makes. *Id.* "For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.*

To sustain a conviction for possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), the United States must prove beyond a reasonable doubt that the defendant "(1) knowingly (2) possessed a firearm (3) in furtherance of any drug trafficking crime for which he could be

prosecuted in a court of the United States." *United States v. Woodard*, 531 F.3d 1352, 1362 (11th Cir. 2008) (footnote omitted).

Knowing possession may be actual or constructive, sole or joint. *United States v. Crawford*, 906 F.2d 1531, 1535 (11th Cir. 1990). A defendant constructively possesses a firearm if he has "ownership, dominion, or control over the [firearm] itself or dominion or control over the premises … in which the [firearm] is concealed." *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005). The firearm does not need to be on or even near the defendant's person. *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004). The defendant's knowledge of the firearm's presence and his power and intention to take control of it later suffice to show knowing possession, *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011), but his mere presence in the area of the firearm—without more—does not, *United States v. Beckles*, 565 F.3d 832, 841 (11th Cir. 2009).

A defendant possesses a firearm "in furtherance of" a drug trafficking crime if "the firearm helped, furthered, promoted, or advanced the drug trafficking." *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002). Thus, "there must be a showing of some nexus between the firearm and the drug selling operation"; "the presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself." *Id.* at 1253 (internal quotation marks omitted). Factors pertinent to the "in furtherance of" element include the type of drug activity, the accessibility of the firearm, the type of firearm, whether the firearm is stolen, the status of the firearm's possession (illegal or legitimate), whether the

firearm is loaded, the firearm's proximity to the drugs or drug profits, and the time and circumstances under which the firearm is found. *United States v. Williams*, 731 F.3d 1222, 1232 (11th Cir. 2013).

Jackson contends that Burke did not investigate the gun charge at all and that, if he had, "he would have discovered that the gun involved was not used in any manner whatsoever as part of the one drug transaction" and, further, was not in close proximity to him during the drug transaction. Civ. Doc. 1 at 15–16. But Jackson's spontaneous disclosure at the sentencing hearing that he had possessed the gun to protect the money he planned to use to buy the cocaine (or to protect himself while carrying the money) belies his contention that investigation would have disclosed that he had not possessed the gun in furtherance of the drug transaction; possession of a gun to protect drug money indisputably satisfies the "in connection with" element. *See* Crim. Doc. 90 at 22–23 ("That gun was there because of that money. It was just too much money, too much money. Of course you're going to have a gun. Somebody might kill you out there. You know, I'm just saying. You know, I can't even have that money without a gun, you know, or something, butter knife or a switch blade or something."). Furthermore, in light of the additional facts that Jackson has never contested (for the second Walmart meeting, he and Perez arrived in the Mercedes, he exited the Mercedes with a bag of money to buy the cocaine, the agents gave a take-down signal and arrested him, he told them that there was a weapon on the floor behind the driver's seat, and they found a loaded and chambered gun there, Crim. Doc. 89 at 29–30; PSR ¶¶ 7–14), that amply prove a § 924(c)(1)(A) crime, he

has not shown a reasonable probability that the results in the criminal case would have been different if Burke had conducted an investigation to determine the precise distance between the gun and his arrest.

The case against Jackson, moreover, was as straightforward as a federal criminal case can get (the crimes primarily involved just two parking-lot meetings on the same day) and was evidenced by audio and video recordings as well as Jackson's admission that the gun was his. Little if any investigation was necessary to render effective assistance of counsel; faced with that overwhelming evidence, reasonable counsel could decide that, rather than attempt to defend against the charges, the best strategy would be to mitigate the seemingly inevitable sentences (up to life for the gun crime) through timely and forthright acceptance of responsibility. *See Strickland, 466 U.S. at 690*–91. That conclusion is made even stronger by the fact that counsel here is a federal criminal defense lawyer with a wealth of experience (nearly three decades, Civ. Doc. 15 at 64). *See Fugate, 261 F.3d at 1216* (strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance "is even stronger when the reviewing court is examining the performance of an experienced trial counsel").

Without a showing of either ineffectiveness or prejudice, Holmes has not satisfied his burden of demonstrating that Burke had been constitutionally ineffective in failing to investigate the drug crime. Thus, denial of § 2255 relief to Jackson on ground two is warranted.

3.    *Ground Three (Failure to Convey All Plea Offers)*

In *Missouri v. Frye*, 132 S. Ct. 1399, 1404–08 (2012), and *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012), the Supreme Court held that the Sixth Amendment right to effective assistance of counsel extends to the negotiation and consideration of plea offers that lapse or are rejected. The Court specifically held that counsel has a "duty to communicate formal offers from the prosecution to accept a plea," and that, in general, where such an offer is not communicated to the defendant, counsel "[does] not render the effective assistance the Constitution requires." *Frye*, 132 S. Ct. at 1408. The Court also held that, to show prejudice under *Strickland*, a defendant must demonstrate a reasonable probability that he would have accepted a plea offer but for counsel's ineffective assistance, and the plea would have resulted in a lesser charge or a lower sentence. *Frye*, 132 S. Ct. at 1409; *see also Lafler*, 132 S. Ct. at 1391 (concluding that defendant had satisfied *Strickland*).

Citing *Frye* and *Lafler*, Jackson contends, "At the time of his sentenc[ing] hearing, [he] learned for the first time that the offer he agreed to had expired. His counsel failed to advise him of any deadline for acceptance of such offer. As a result, [he] was required to accept a deal from the government with more severe terms, i.e. more months in prison. As a result of his counsel's actions, [he] was prejudiced." Civ. Doc. 1 at 16–17. In light of his acknowledgment at the evidentiary hearing that he was unaware of any offers and aware that he would have to provide substantial assistance to enable the Court to impose less than ten years' imprisonment but did not have any to provide, and the prosecutor's confirmation that the United States had

not made any offers (whether or not formal), Jackson's contention does not make sense and appears to be nothing more than a ground copied from another § 2255 motion that has no application here. Thus, denial of § 2255 relief to Jackson on ground three is warranted.

## B.   *Certificate of Appealability*

A movant may not appeal the denial of § 2255 relief without a certificate of appealability, 28 U.S.C. § 2253(c)(1), which a district court must either issue or deny when it enters a final order adverse to the movant, Rule 11 of the Rules Governing Section 2255 Proceedings. A judge may not issue a certificate of appealability unless the movant makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which is a showing "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If a district court issues a certificate of appealability, he or she must indicate which specific issue or issues satisfy the substantial-showing standard. 28 U.S.C. § 2253(c)(3); Rule 11 of the Rules Governing Section 2255 Proceedings.

If the Court adopts the proposed findings and recommended disposition, denial of a certificate of appealability is warranted because no reasonable jurist would find that the Court's assessment of Jackson's ineffective-assistance-of-counsel claims is either debatable or wrong. As Jackson's counsel conceded, ground one (failure to file a notice of appeal) pares down to a credibility determination, which is virtually

unchallengable.[8] The Court's assessment of ground two (failure to investigate the drug crime) is neither wrong nor debatable in light of the facts that Jackson has never contested. And ground three (failure to convey all plea offers), as explained, is essentially frivolous.

## VI.   Conclusion

Thus, as answers to the Court's questions: (1) Jackson did not specifically request Burke to file a notice of appeal; (2) a rational defendant would not have wanted to appeal, and Jackson had not reasonably demonstrated to counsel that he was interested in appealing; and (3) Burke therefore did not have a constitutional obligation to consult with Jackson in a reasonable effort to determine his wishes with respect to an appeal. *See* Civ. Doc. 10 at 2. For those and the other reasons in this report and recommendation, I recommend that Judge Howard issue the following decretal:

(1)   The Court **denies** Jackson's 28 U.S.C. § 2255 motion, Civ. Doc. 1.

(2)   Jackson is not entitled to a certificate of appealability under 28 U.S.C. § 2253(c)(1).

---

[8]"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Indeed, the Supreme Court "ha[s] emphasized that where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Amadeo v. Zant*, 486 U.S. 214, 226 (1988) (internal quotation marks omitted). Thus, the Eleventh Circuit may not review a district court's credibility determinations unless the appellant demonstrates that the credited testimony was "*exceedingly* improbable," i.e., "contrary to the laws of nature" or "so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Ramirez-Chilel*, 289 F.3d at 749 (emphasis in original; internal quotation marks omitted).

(3)     The Court directs the clerk to enter final judgment in favor of the United States against Jackson and close the file.

(4)     Because Jackson is not entitled to a certificate of appealability, any appeal by him will not be taken in good faith. Under 28 U.S.C. § 1915(a)(3), he therefore may not appeal in forma pauperis. If he files a motion to appeal in forma pauperis, the Court directs the clerk to terminate the motion from the pending motions report. The termination will serve as a denial of the motion.

## VII.   Objections

A party may file specific written objections to proposed findings and a recommended disposition within 14 days of service of a magistrate judge's report and recommendation. Fed. R. Civ. P. 72(b)(2); Rule 12 of the Rules Governing Section 2255 Proceedings; *see also* Fed. R. Civ. P. 6(d) (adding three days after period otherwise would expire if party must act within a specified period after service and service is made by electronic filing as provided by Federal Rule of Civil Procedure 5(b)(2)(E)). The district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [She] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); *accord* Fed. R. Civ. P. 72(b)(3). But a district judge need not consider frivolous, conclusive, or general objections. *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). A party's failure to specifically object in writing may alter the scope of direct and appellate review. *See* Fed. R. Civ. P. 72(b)(3); *Dupree v. Warden*, 715

F.3d 1295, 1300 (11th Cir. 2013). Thus, here, either party must file any specific written objection by **October 20, 2014**, or risk waiver of that objection.

  **Entered** in Jacksonville, Florida, on October 2, 2014.

            _____

             PATRICIA D. BARKSDALE
             *United States Magistrate Judge*

c: Mac Heavener, Assistant United States Attorney
  Eric Roper, Esquire